# 21-1206

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*Michael Binday,*
*Petitioner,*

*—against—*

*United States of America,*
*Respondent.*

ON MOTION TO VACATE CONVICTION
FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, Doc. No. 12-cr-152 (CM)

BRIEF OF PETITIONER MICHAEL BINDAY
ON REMAND FROM THE UNITED STATES SUPREME COURT

David W. Shapiro
The Norton Law Firm
299 Third Street, Suite 200
Oakland, CA 94607
(510) 906-4906
Attorneys for Petitioner Michael Binday

# TABLE OF CONTENTS

MOTION     1

SUMMARY OF RELIEF SOUGHT     1

FACTS RELEVANT TO THIS MOTION     2

PROCEDURAL HISTORY: BINDAY'S CHALLENGES TO "RIGHT TO CONTROL" FRAUD AND THE SUPREME COURT'S VINDICATION OF HIS POSITION     3

    THE GOVERNMENT CHOOSES RIGHT TO CONTROL AS ITS STRATEGY.     3

    THE JURY WAS GIVEN A QUINTESSENTIAL RIGHT TO CONTROL CHARGE.     4

    THIS COURT RELIED ON RIGHT TO CONTROL TO AFFIRM THE CONVICTION.     5

    BINDAY ASKED THIS COURT TO REVISIT RIGHT TO CONTROL EN BANC.     5

    BINDAY FILES A 2255 MOTION CONCERNING THE RIGHT TO CONTROL.     6

    BINDAY'S SECOND CERTIORARI PETITION SEEKING RIGHT TO CONTROL REVIEW.     7

    BINDAY'S SUPREME COURT *AMICUS* BRIEFS CHALLENGING RIGHT TO CONTROL.     7

    THE SUPREME COURT REVERSED THE CONVICTIONS IN *KELLY*.     8

    BINDAY FILES A 2255 MOTION BASED ON *KELLY V. UNITED STATES*.     9

    BINDAY'S THIRD CERTIORARI PETITION CHALLENGING RIGHT TO CONTROL FRAUD.     10

    THE SUPREME COURT GRANTS BINDAY'S PETITION, VACATES, AND REMANDS.     10

    THIS COURT RECALLS ITS MANDATE FROM BINDAY'S 2255 MOTION OF JUNE 2017.     10

ARGUMENT     11

I.    THE REMAND TO THIS COURT IS LIMITED TO THE EFFECT OF *CIMINELLI* ON BINDAY'S CONVICTION     11

II.    A MOTION BASED ON *CIMINELLI* AND THE SUPREME COURT'S ORDER VACATING THIS COURT'S 2021 ORDER IS NOT SECOND OR SUCCESSIVE     13

    A.    THE MEANING OF SECOND OR SUCCESSIVE.     13

    B.    PRECLUDING BINDAY'S PETITION NOW IS INCONSISTENT WITH THE ABUSE-OF-THE-WRIT DOCTRINE.     20

C.   AN OVERBROAD APPLICATION OF "SECOND OR SUCCESSIVE" WILL DAMAGE
HABEAS PRACTICE.                                                    21

D.   PRECLUDING BINDAY'S PETITION AFTER *CIMINELLI* IMPEDES FINALITY AND
DETERRENCE INTERESTS.                                              22

III.   BINDAY HAS MADE A PRIMA FACIE SHOWING THAT CIMINELLI IS A
NEW RULE OF CONSTITUTIONAL LAW RETROACTIVE TO CASES ON
COLLATERAL REVIEW                                                  24

A.   BINDAY NEED ONLY MAKE A PRIMA FACIE SHOWING THAT *CIMINELLI* IS A
RETROACTIVE CONSTITUTIONAL DECISION.                               24

B.   *CIMINELLI* RELIED ON CONSTITUTIONAL PRINCIPLES.              25

C.   THE CASES *CIMINELLI* RELIED ON WERE ALL CONSTITUTIONAL DECISIONS.   27

D.   CIMINELLI IS RETROACTIVE IN BINDAY'S CASE.                    32

E.   THE SUPREME COURT'S "PROPERTY" DECISIONS HAVE ALL BEEN RETROACTIVE.
34

F.   THE SUPREME COURT'S GVR OF BINDAY'S CASE DEMONSTRATES *CIMINELLI*
APPLIES TO CASES ON COLLATERAL REVIEW.                            36

G.   *CIMINELLI* WAS NOT A STATUTORY INTERPRETATION CASE.          37

IV.   THE COURT MAY RECALL ITS MANDATE FROM BINDAY'S DIRECT
APPEAL AND APPLY *CIMINELLI* TO A REVIEW OF THE CONVICTION         42

V.   CONCLUSION                                                    46

TABLE OF AUTHORITIES

Page(s)

Cases

*Bailey v. United States*,
516 U.S. 137 (1995) ........................................................................39

*Banister v. Davis*,
140 S. Ct. 1698 (2020) ..............................................................14, 15

*Bennett v. United States*,
119 F.3d 468 (7th Cir. 1997) ..........................................................24

*Bottone v. United States*,
350 F.3d 59 (2d Cir. 2003) ..............................................................44

*Bousley v. United States*,
523 U.S. 614 (1998) ..........................................................11, 20, 33

*Buck v. Davis*,
580 U.S. 100 (2017) ........................................................................12

*Carlson v. Green*,
446 U.S. 14 (1980) ............................................................................7

*Castro v. United States*,
540 U.S. 375 (2003) ........................................................................14

*Cephas v. Nash*,
328 F.3d 98 (2d Cir. 2003) ..............................................................18

*Chiarella v. United States*,
445 U.S. 222 (1980) ........................................................................44

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*,
709 F.3d 140 (2d Cir. 2013) ............................................................43

*Ciminelli v. United States*,
598 U.S. 306 (2023) ................................................................. Passim

*Cleveland v. United States*,
531 U.S. 12 (2000) ..........................................................8, 9, 28, 39

*Colino v. United States*,
2012 WL 1198446 (C.D. Cal. 2012) ...............................................35

*Davis v. United States*,
417 U.S. 333 (1974) ................................................................11, 20

*DeGuzman v. United States*,
  2011 WL 777934 (W.D. Tex. Feb. 25, 2011) ......................................................36

*Edwards v. Vannoy*,
  141 S. Ct. 1547 (2021) ................................................................................33, 44

*Esposito v. Ashcroft*,
  392 F.3d 549 (2d Cir. 2004) ...............................................................................20

*Fasulo v. United States*,
  272 U.S. 620 (1926) ...................................................................................28, 41

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.*,
  143 S. Ct. 1176 (2023) ........................................................................................1

*Ford v. Wainwright*,
  477 U.S. 399 (1986) ...........................................................................................15

*Fountain v. United States*,
  357 F.3d 250 (2d Cir. 2004) .................................................................................8

*Grzegorczyk v. United States*,
  142 S. Ct. 2580 (2022) .......................................................................................12

*Henry v. City of Rock Hill*,
  376 U.S. 776 (1964) ...........................................................................................13

*In re Jones*,
  54 F.4th 947 (6th Cir. 2022) ...............................................................................16

*In re Jones*,
  652 F.3d 603 (6th Cir. 2010) ...............................................................................16

*In re Lott*,
  366 F.3d 431 (6th Cir. 2004) ...............................................................................24

*In re Whirlpool Corp. Front–Loading Washer Products Liability Litigation*,
  722 F.3d 838 (6th Cir. 2013) ...............................................................................13

*Ingber v. Enzor*,
  841 F.2d 450 (2d Cir. 1988) ...............................................................................34

*Johnson v. United States*,
  576 U.S. 591 (2015) ...............................................................................11, 25, 40

*Johnson v. Wynder*,
  408 F. App'x 616 (3d Cir. 2010) .........................................................................16

iv

*Jones v. Hendrix*,
  8 F.4th 683 (8th Cir. 2021) .......................................................................18, 19

*Kelly* v. *United States*,
  140 S.Ct. 1565 (2020) ................................................................. Passim

*Lawrence v. Chater*,
  516 U.S. 163 (1996) (*per curiam* ........................................................12

*Magnuson v. United States*,
  861 F.2d 166 (7th Cir. 1988) .................................................................34

*Magwood v. Patterson*,
  561 U.S. 320 (2010) .................................................................................14

*Martignoni v. United States*,
  2011 WL 4834217 (S.D.N.Y. Oct. 12, 2011).....................................35

*McCormick v. United States*,
  500 U.S. 257 ........................................................................................27, 45

*McDonnell v. United States*,
  579 U.S. 550 (2016) .................................................................................38

*McNally v. United States*,
  483 U.S. 350 (1987) .............................................................9, 28, 30, 39

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) .................................................................................41

*Panetti v. Quarterman*,
  551 U.S. 930 (2007) .......................................................................13, 14, 15

*Quezada v. Smith*,
  624 F.3d 514 (2d Cir. 2010) ..................................................................24

*Rehaif v. United States*,
  139 S. Ct. 2191 (2019) .....................................................................18, 37, 38

*Rodrigues v. United States*,
  2011 WL 529158 (D. Haw. Jan. 31, 2011) .........................................35

*Sanders v. United States*,
  373 U.S. 1 (1963) ...............................................................................14, 15

*Sargent v. Columbia Forest Prod., Inc.*,
  75 F.3d 86 (2d Cir. 1996) .......................................................................43

*Schriro v. Summerlin*,
  542 U.S. 348 (2004) .................................................................................33

v

*Scott v. United States*,
   890 F.3d 1239 (11th Cir. 2018) ........................................................16

*Simpson v. Jackson*,
   2014 WL 5824895 (S.D. Ohio Nov. 10, 2014) ..................................13

*Skilling v. United States*,
   561 U.S. 358 (2010) ...............................................................3, 39, 40

*Slack v. McDaniel*,
   529 U.S. 473 (2000) .........................................................................13

*Smith v. Goguen*,
   415 U.S. 566 (1974) (granting habeas corpus .................................39

*Stayton v. United States*,
   766 F. Supp. 2d 1260 (M.D. Ala. 2011) ...........................................34

*Stewart v. Martinez-Villareal*,
   523 U.S. 637 (1998) .........................................................................15

*Stewart v. United States*,
   646 F.3d 856 (11th Cir. 2011) ..........................................................16

*Teague v. Lane*,
   489 U.S. 288 (1989) .........................................................................11

*Triestman v. United States*,
   124 F.3d 361 (2d Cir. 1997) .......................................................18, 19

*Turner v. United States*,
   693 F.3d 756 (7th Cir. 2012) ............................................................35

*Tyler v. Cain*,
   533 U.S. 656 (2001) ....................................................................25, 42

*United States v. Alpers*,
   338 U.S. 680 (1950) .........................................................................29

*United States v. Bass*,
   404 U.S. 336 (1971) .........................................................................29

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) .............................................1, 4, 5, 45

*United States v. Booker*,
   543 U.S. 220 (2005) .........................................................................13

*United States v. Bowers*,
   220 F. App'x 402 (6th Cir. March 19, 2007) ....................................13

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992) .............................................................5

*United States v. Caso*,
    200 F. Supp. 3d 227 (D.D.C. 2012)................................................36

*United States v. Eaton*,
    144 U.S. 677 (1892) ........................................................................29

*United States v. Ferguson*,
    676 F.3d 260 (2d Cir. 2011) .............................................................6

*United States v. Finazzo*,
    850 F.3d 94 (2d Cir. 2017) ...............................................................6

*United States v. Full Play Group*,
    2023 WL 5672268 (E.D.N.Y. Sept. 1, 2023) ..................................31

*United States v. Goodrich*,
    871 F.2d 1011 (11th Cir. 1989) ......................................................45

*United States v. Hansen*,
    143 S. Ct. 1932 (2023) ....................................................................32

*United States v. Jaramillo*,
    413 Fed. Appx. 979 (9th Cir. 2011) ................................................35

*United States v. Jennings*,
    2011 WL 3609298 (D. Minn. Aug. 15, 2011).................................35

*United States v. Levis*,
    488 F. App'x 481 (2d Cir. 2012) .......................................................6

*United States v. Lopez*,
    577 F.3d 1053 (9th Cir. 2009) ........................................................17

*United States v. Lowe*,
    664 F. App'x 38 (2d Cir. 2016).........................................................6

*United States v. Mitchell*,
    867 F.2d 1232 (9th Cir. 1989)........................................................34

*United States v. Nordlicht*,
    2023 WL 4490615 (E.D.N.Y. July 12, 2023) ..................................31

*United States v. O'Brien*,
    560 U.S. 218 (2010) ..................................................................39, 42

*United States v. O'Garro*,
    700 F. App'x 52 (2d Cir. 2017)..........................................................6

vii

*United States v. Orlando*,
  363 F.3d 596 (6th Cir. 2004) .............................................................13

*United States v. Peter*,
  310 F.3d 709 (11th Cir. 2002) ...........................................................34

*United States v. Porat*,
  2023 WL 5009238 (3d Cir. Aug. 7, 2023) ....................................30, 31

*United States v. Post*,
  950 F. Supp. 2d 519 (S.D.N.Y. 2013), the court dismissed ................35

*United States v. Resnick*,
  299 U.S. 207 (1936) ...........................................................................29

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003) .........................................................29, 30

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ..............................................................28

*United States v. Sanin*,
  252 F.3d 79 (2d Cir. 2001) ..................................................................17

*United States v. Shelton*,
  848 F.2d 1485 (10th Cir. 1988) ..........................................................34

*United States v. Siegel*,
  717 F.2d 9 (2d Cir. 1983) ....................................................................32

*United States v. Szur*,
  289 F.3d 200 (2d Cir. 2002) ................................................................45

*United States v. Tehin*,
  2012 WL 3638543 (N.D. Cal. Aug. 22, 2012) ...................................35

*United States v. Viloski*,
  557 F. App'x 28 (2d Cir. 2014) .............................................................6

*United States v. Yates*,
  16 F.4th 256 (9th Cir. 2021) ...............................................................45

*United States v Stinn,* ,
  856 F.Supp.2d 531 (E.D.N.Y. 2012) ....................................................6

*Urinyi v. United States*,
  607 F.3d 318 (2d Cir. 2010) ................................................................22

*Villanueva v. United States*,
  893 F.3d 123 (2d Cir. 2018) .........................................................24, 25

viii

*Vu v. United States,*
   648 F.3d 111 (2d Cir. 2011) .......................................................................16

*Welch v. United States,*
   136 S. Ct. 1257 (2016) ...................................................................33, 39, 40

*Wellons v. Hall,*
   558 U.S. 220 (2010) .....................................................................................12

*Whab v. United States,*
   408 F.3d 116 (2d Cir. 2005) .......................................................................16

*Williams v. Taylor,*
   529 U.S. 362 (2000) .....................................................................................15

*Wooden v. United States,*
   142 S. Ct. 1063 (2022) .................................................................................28

*Woratzeck v. Stewart,*
   118 F.3d 648 (9th Cir. 1997) .......................................................................24

*Yates v. United States,*
   354 U.S. 298 (1957) .................................................................................9, 45

*Zipfel v. Halliburton Co.,*
   861 F.2d 565 (9th Cir.1988) .......................................................................42

Statutes

18 U.S.C. section 924(c) ..............................................................................41

18 U.S.C. § 1346 ...........................................................................................35

28 U.S.C. § 2241 .............................................................................................1

28 U.S.C. § 2254(b) .....................................................................................15

28 U.S.C. § 2255 .............................................................................................1

Section 924(c)(1) ...........................................................................................41

section 2254..................................................................................................15

section 2255(h) ...............................................................................................2

Rules

Fed.R.Civ.P. 60(b)........................................................................................42

ix

Other Authorities

*An Economic Approach to the Law of Evidence*,
  51 Stan. L. Rev. 1477 (1999) ................................................................23

*Federal Practice and Procedure* § 3938 (1977) ....................................................42

*Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*,
  42 Duke L.J. 945 (1993) ......................................................................32

Restatement (Second) of Contracts § 344 (1981) ....................................................4

*The "Right to Control" Theory of Fraud: When Deception Without Harm Becomes a Crime*,
  43 Cardozo L. Rev. 135 (2021) ...........................................................30

Binday Trial, Tr. at 1579 ..................................................................4

Brief of the United States, *Welch v. United States of America*,
  2016 WL 1165972 (U.S. 2016) ...........................................................41

## MOTION

Michael Binday, through his counsel, moves this Court (a) for an order that a motion pursuant to 28 U.S.C. § 2255 based on *Ciminelli v. United States*, 598 U.S. 306 (2023), would not be second or successive or (b) for an order that Binday has made a prima facie showing that *Ciminelli* is a retroactive constitutional decision and thus Binday is authorized to file a 2255 motion.

In the alternative, since the Supreme Court directed this Court to consider Binday's case in light of *Ciminelli* and abrogated *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (hereafter, "*Binday*")—the decision affirming Binday's conviction—Binday requests that this Court recall its mandate in *Binday* and reverse Binday's conviction.

## SUMMARY OF RELIEF SOUGHT

On October 12, 2021, this Court ruled that Binday's second-in-time section 2255 motion pursuant to *Kelly* v. *United States*, 140 S.Ct. 1565 (2020), was second or successive, *Kelly* was not based on constitutional principles, and Binday was not actually innocent for purposes of his 28 U.S.C. § 2241 motion because this Court had recently reaffirmed its right to control legal theory of fraud (Doc. 46)[1] (the "2021 Order").

However, on May 22, 2023, the Supreme Court granted Binday's certiorari petition challenging that 2021 Order, vacated that judgment, and remanded to this Court to consider Binday's case "in light of *Ciminelli*." Doc. 80. In *Ciminelli*, the Supreme Court expressly abrogated *Binday*, thus eliminating the reasoning, factual recitation, and judgment of that opinion. *See Fin. Oversight & Mgmt. Bd. for*

---

[1] "Doc." references in this brief are to this Court's docket in *Binday v. United States*, No. 21-1206. Docket entries from filings in other courts or proceedings will include the court name and docket number.

1

*Puerto Rico v. Centro de Periodismo Investigativo, Inc.*, 143 S. Ct. 1176, 1180 (2023) (abrogate is "legalspeak for eliminates").

Binday now writes on a clean slate. There is no prior order analyzing his case under *Ciminelli*, nor is there any proper legal basis for his conviction. The combination of the Supreme Court's order vacating this Court's 2021 Order and abrogating *Binday* effectively reversed Binday's conviction. The question now is what procedural course(s) are open to Binday to obtain the relief that he deserves.

There are at least three courses. First, the Court may allow Binday to file a second in time 2255 motion based on *Ciminelli* because such a motion would not be "second or successive" as defined by the Supreme Court. Second, the Court may allow Binday to file a new 2255 motion because *Ciminelli* was a retroactive, constitutionally based decision exempt from the hurdle of section 2255(h). Third, the Court may recall the mandate from *Binday* and analyze the case under *Ciminelli*, as it will for the *Ciminelli* defendants. That is, it will decide whether Binday's conviction was based on an improper legal theory and insufficient evidence.

## FACTS RELEVANT TO THIS MOTION

Michael Binday, an insurance broker, was convicted of mail and wire fraud under the Second Circuit's expansive "right to control" theory. The government alleged Binday deprived insurance companies of information they considered valuable by checking off a box on insurance applications indicating the insureds did not intend to sell the policies to investors, when in fact they did: a breach of contract. The insurance companies were paid all the premiums they were due; no insured lied about their age or health—the two critical factors in the decision to issue life insurance policies. There was no evidence the insurers returned the premiums they collected.

2

Even though the government did not attempt to prove that the insurance companies lost money on the policies Binday procured, this Court held that Binday committed fraud because a "cognizable harm occurs where the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions." *Ciminelli*, 598 U.S. at 313 (quoting *Binday*) (cleaned up).

The Supreme Court ruled in *Ciminelli* that the "harm" proved against Binday was not property and granted Binday's petition for a writ of certiorari, vacated this Court's judgment, and remanded.

## PROCEDURAL HISTORY: BINDAY'S CHALLENGES TO "RIGHT TO CONTROL" FRAUD AND THE SUPREME COURT'S VINDICATION OF HIS POSITION

The Government Chooses Right to Control as its Strategy.

One month before Binday's 2013 trial, the government filed an *in limine* motion to exclude all defense evidence proving the insurers were unharmed, *Binday*, No. 12-152 (SDNY), Doc. 231 at 2, and announced it would rely on the right to control theory and its concomitant breach of contract claim. *Id*. Doc. 237 at 2-3. The defense objected, noting that its trial subpoenas produced evidence "demonstrating unambiguously that the Insurers' issuance of STOLI policies did not cause them any economic harm, unequivocally rebutting the government's theory of mail and wire fraud." *Id*. Doc. 233 at 8. To avoid that proof, the government changed its theory of property and pursued an "easier" path to victory. *See supra* at 31 (quoting Justice Kavanagh).

Binday's trial counsel argued that the government's change to the right to control theory was a constructive amendment and there were "fundamental issues regarding the viability of the government's newly embraced 'right to control' theory in light of the Supreme Court's decision in [*Skilling v. United States,* 561

U.S. 358, 400 (2010)], which limited the government's ability to pursue fraud charges based on the deprivation of 'intangible rights.'" He noted that he had "not had an appropriate opportunity to address … whether the government's newly articulated theory alleges a violation of the mail and wire fraud statutes as a matter of law." *Binday*, No. 12-152, Doc. 233 at 29 n.9.

The district court rejected Binday's constructive amendment claim but did not address *Skilling*'s impact on the right to control theory. *Id*. Doc. 243 at 6-11. It explained that a person who lies or omits information during contract negotiations can be convicted of fraud if the government proves that "the victims did not get what they bargained for (rather than exactly what they paid for), such that there was a discrepancy between the benefits reasonably anticipated and actual benefits received." *Id.* Doc. 243 at 8-9.[2]  The court did not mention broker's commissions as the "money" at issue.

The Jury Was Given a Quintessential Right to Control Charge.

The district court gave the jury a "right to control" instruction: "[A] person can also be deprived of money or property when he is deprived of the ability to make an informed economic decision about what to do with his money or property. We referred to that as being deprived of the right to control money or property." *United States v. Binday*, No. 12-152 (SDNY), Tr. at 1579.

The jury convicted Binday.

---

[2]   This formulation of "right to control fraud" parallels the Restatement of Contract's "expectancy interest" in breach of contract cases: the promisee's "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed," Restatement (Second) of Contracts § 344 (1981), thus confirming Binday was prosecuted for breaching a contract.

4

This Court Relied on Right to Control to Affirm the Conviction.

On direct appeal, Binday argued that the facts of his case did not fall within conduct proscribed by the Second Circuit's law on the right to control. *Binday*, No. 14-2809, Doc. 93, at 25 *et seq*. He also pointed out that the right to control theory was rejected by the Ninth Circuit in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992). *Id.*, Doc. 136 at 3-4.

On October 26, 2015, this Court affirmed Binday's conviction and sentence because "the property interests protected by the [mail and wire fraud] statutes include the interest of a victim in controlling his or her own assets." *Binday*, 804 F.3d at 570. The Court thus held that Binday was guilty because he interfered with the insurers' right to control their "assets." *Id*. at 585.

Binday Asked This Court to Revisit Right to Control En Banc.

Binday filed a petition for rehearing en banc on November 10, 2015, arguing that the Supreme Court in *Skilling* had rejected the Second Circuit's characterization of the right to control as property under the mail and wire fraud statutes.

On December 14, 2015, the Second Circuit denied Binday's petition for rehearing en banc.

Binday Seeks Supreme Court Review of Right to Control Fraud.

Binday then petitioned the Supreme Court for review framing the issue as follows: "Whether a defendant may be convicted of federal criminal fraud when the purported victim has suffered no loss of tangible property, but has instead only been deprived of the intangible 'right to control' with whom it does business." *Binday v. United States*, No. 15-1140 (U.S.) at i.

Binday's certiorari petition was denied on June 20, 2016.

5

Binday Files a 2255 Motion Concerning the Right to Control.

Having exhausted his direct appeal challenges, and aware that this Court repeatedly reaffirmed the right to control theory of fraud, and the Supreme Court denied review in several of those cases,[3] on June 20, 2017, Binday filed a 2255 motion for ineffective assistance of counsel because his trial attorney misstated the right to control standard in his arguments. *Binday v. United States* No. 17-cv-4723 (SDNY) Doc. 1. He reminded the Court that he had not abandoned his challenge to the right to control theory:

> Mr. Binday continues to assert that that the right to control theory is inconsistent with United States Supreme Court precedent, including *Skilling* and *Cleveland*, both of which rejected the "right to control" as proof of the property element of fraud. … By raising [trial counsel's] misunderstanding of the Second Circuit precedent discussing the right to control theory, Mr. Binday expressly does not waive his right to re-assert his objection to the right to control theory in a future proper forum— particularly as a claim of actual innocence in a petition for writ of habeas corpus.

---

[3] For example: *United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017); *United States v. O'Garro*, 700 F. App'x 52 (2d Cir. 2017); *United States v. Lowe*, 664 F. App'x 38, 43 (2d Cir. 2016), *cert. denied,* 137 S. Ct. 1445 (2017); *United States v. Viloski*, 557 F. App'x 28 (2d Cir. 2014), *cert. denied*, 137 S.Ct. 1223 (2017); *United States v Stinn,* 856 F.Supp.2d 531, 544 (E.D.N.Y. 2012), *aff'd,* 515 F.App'x 4 (2d Cir. 2013); *United States v. Levis*, 488 F. App'x 481 (2d Cir. 2012), *cert. denied,* 569 U.S. 957 (2013); *United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011).

The *Stinn* jury instruction was especially overbroad: the jury was told to convict if it found a corporate officer deprived "*a shareholder (or future shareholder) of valuable economic information*"—in other words, he made a false statement and everyone in the world was a victim. 856 F.Supp.2d at 544 (emphasis added). This Court approved that formulation.

*Binday v. United States*, No. 12-cr-152 (SDNY) Doc. 446 at 5-6.

The district court denied Binday's motion and a certificate of appealability. *Binday*, No. 12-cr-152, Doc. 448. Binday asked this Court for a certificate of appealability, which it denied. *Id.* Doc. 457. Binday then moved for reconsideration on that issue, which was denied on May 6, 2019. *Binday v. United States*, No. 18-2143 (2d Cir.) Docs. 76, 80.

Binday's Second Certiorari Petition Seeking Right to Control Review.

On August 27, 2019, Binday sought review in the Supreme Court. He raised two questions: (a) whether a trial lawyer is ineffective if he embraces a legal argument contrary to existing circuit law, and (b) "[i]s the strand of property rights known as the 'right to control property' sufficiently 'property' within the meaning of the fraud statutes given that this Court rejected the suggestion in *Cleveland*, *Skilling* and *Sekhar*?" *Binday v. United States*, No. 19-273 (S.Ct.), Petition for a writ of certiorari at ii. He did so because the Supreme Court had granted review in *Kelly*, a Third Circuit decision that affirmed convictions based, at least in the alternative, on the right to control theory. *Id.*[4]

Binday's Supreme Court *Amicus* Briefs Challenging Right to Control.

Binday filed amicus briefs in *Kelly* and in *United States v. Aldissi*, No. 19-5805 (U.S.), in which he argued that the right to control theory was inconsistent with Supreme Court precedent and unconstitutional. (Copies of the amicus briefs were attached as exhibits Binday's 2255 motion filed after *Kelly*. *Binday v. United*

---

[4] Binday explained in his certiorari petition that "*Kelly* will address the legitimacy of the right to control theory. Binday may thus raise the issue in this petition because it will be 'squarely presented and fully briefed. It is an important, recurring issue and is properly raised in another petition for certiorari. . . .' *See Carlson v. Green*, 446 U.S. 14, 17 n.2 (1980)." *Binday*, No. 19-273 (S.Ct.) Petition for Certiorari at ii.

*States* (SDNY) 12 Cr 152, Doc. 479 Exhs. 1 and 2, which was transferred to this
Court.)

The Supreme Court Reversed the Convictions in *Kelly*.

The Supreme Court did not grant Binday's certiorari petition, but it did
reverse the convictions in *Kelly*. The Court focused on the incidental nature of the
economic harm caused by the defendant's alleged scheme and ruled that
interference with a victim's property rights through false statements cannot support
a fraud conviction if the economic impact of deceit is an "incidental (even if
foreseen) byproduct" of the alleged scheme. *Kelly*, 140 S. Ct. at 1573-74.

Contrary to this Court's statement in the 2021 Order, *Kelly* was a
constitutionally based decision.[5]

The Third Circuit affirmed the convictions in *Kelly* (1) because it thought
the defendants obtained money or property when their conduct caused their
employer to spend money *and* (2) because of the right to control theory. The
Supreme Court opined more extensively on the first ground, but in the end, its
decision circumscribed the universe of people subject to the federal fraud statutes
by eliminating those—like Kelly and her co-defendant—who were only deceitful
but whose object was not to obtain money or property. They lied, but they were
not hoping to obtain money or property in exchange for their lies.

*Kelly* held that incidental costs associated with deceit—evidence the
government relied on in that case and in other right to control cases—do not

---

[5]      The constitutional basis for *Kelly* is relevant here to explain the distinction
between constitutional and statutory interpretation cases. For example, this Court
previously unduly limited the Supreme Court's *Cleveland v. United States*, 531
U.S. 12 (2000), decision as statutory "interpretation," *Fountain v. United States*,
357 F.3d 250, 260 (2d Cir. 2004). Since then, however, *Cleveland* has been the
foundation of several constitutional decisions, including *Ciminelli*.

constitute "money or property." It relied on *McNally v. United States*, 483 U.S. 350 (1987), *Cleveland,* 531 U.S. at 24, 25, and *Skilling* to reach its decision—all decisions applying constitutional principles.  It did not rely on any statutory interpretation cases, maxims, dictionaries, or principles. *Kelly*, 140 S.Ct. at 1571, 1574.  There is no clearer expression of constitutional limits on prosecution and judicial power to create crimes than the Court's statement that the Constitution bars prosecutors from using fraud statutes to "set[] standards of disclosure" because that is a non-legislative "sweeping expansion of federal criminal jurisdiction."  *Id*. (quoting *McNally* and *Cleveland*).

If the Supreme Court in *Kelly* thought the right to control theory was viable, it would have said so and remanded to consider whether *Yates v. United States,* 354 U.S. 298 (1957), required reversal.  It did not do so because it evidently did not consider the right to control to be a proper legal basis for a conviction.

The government consented to vacating the convictions in *Kelly*, thus conceding it had insufficient evidence to prove fraud.  *United States v. Baroni*, No. 15-cr-193 (D.N.J.), Doc. 415 at 2.

Binday Files a 2255 Motion Based on *Kelly v. United States*.

Binday then filed a 2255 motion in the district court arguing that *Kelly* undermined his conviction because his alleged scheme was to *buy* and pay full price for the insurance policies at issue and any incidental costs from the breach of contract were not money he sought to obtain.  *Binday v. United States*, No. 12-cr-152-CM (SDNY), Doc. 479 at 12, 29-30, 32.  The district court forwarded the motion to this Court.

On October 12, 2021, this Court denied Binday leave to file a 2255 motion and denied Binday's motion to vacate his conviction pursuant to section 2241.  No. 21-1206, Doc. 46. The Court reasoned that Binday's 2255 motion was "successive" because it and his first 2255 motion "challenged the same criminal

9

judgment, was decided on the merits, and reached final adjudication before" Binday filed his *Kelly*-based motion.  It further reasoned that *Kelly* was not based on constitutional principles and rather interpreted the fraud statutes.  And finally, it reasoned that *Kelly* did not reject the right to control theory and so Binday was not "actually innocent."  *Id*. at 1-2.

Binday's Third Certiorari Petition Challenging Right to Control Fraud.

On March 12, 2022, Binday filed a petition for certiorari in the United States Supreme Court, again challenging the right to control theory, a few weeks after defendants in *Ciminelli* filed their certiorari petitions.

The Court asked the government to respond to Binday's petition.  On September 21, 2022, the government filed a memorandum of non-opposition, saying that "the Court's resolution of the questions presented in *Ciminelli* and *Jones* [*v*. *Hendrix*, No. 21-857] may affect the judgment of the court of appeals below," and the Court should dispose of Binday's petition in accordance with its decisions in those cases.  *Binday v. United States*, No. 21-1241 (S.Ct.), Memorandum of the United States, September 21, 2022, at 2.

The Supreme Court Grants Binday's Petition, Vacates, and Remands.

On May 22, 2023, eleven days after it decided *Ciminelli*, the Supreme Court granted Binday's petition, along with those of other defendants in the *Ciminelli* case, vacated the orders below, and remanded "for further consideration in light of *Ciminelli*."  Doc. 80.  The Supreme Court's GVR here vacated the entire 2021 Order, including this Court's statement that *Kelly* was not constitutionally based and retroactive. The Court made no reference to *Jones v. Hendrix*.

This Court Recalls its Mandate from Binday's 2255 Motion of June 2017.

On July 18, 2023, this Court recalled its mandate relating to Binday.  Docs. 109-111. The district court filed the certified version of the recall with Binday's

first 2255 motion, thus restoring jurisdiction over Binday's first 2255 motion to this Court.  No. 17-cv-4723 (SDNY), Doc. 19.

**ARGUMENT**

I.    **THE REMAND TO THIS COURT IS LIMITED TO THE EFFECT OF**
    *CIMINELLI* **ON BINDAY'S CONVICTION**

The government chose not to argue to the Supreme Court that Binday's certiorari petition was either second or successive or that *Kelly* (or the anticipated opinion in *Ciminelli*) were merely statutory interpretation decisions.  Instead, it told the Supreme Court that Binday's case would be affected by the decisions in *Ciminelli* and *Jones* (though the Supreme Court ignored the latter decision's effect on Binday's case).  That statement waived any government claim that Binday is procedurally foreclosed from collateral review under *Teague v. Lane*, 489 U.S. 288 (1989).[6]

In an analogous situation—where the petitioner sought relief from a conviction that violated *Johnson v. United States*, 576 U.S. 591 (2015)—the government advised the Supreme Court that when it believes a conviction is invalid, and no other grounds support the defendant's sentence, then "its usual

---

[6]    *Teague* explained that "decisions of th[e Supreme] Court holding that a substantive federal criminal statute does not reach certain conduct, like decisions placing conduct beyond the power of the criminal law-making authority to proscribe, necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal." *Bousley v. United States,* 523 U.S. 614, 620 (1998) (quoting *Teague,* 489 U.S. at 313; *Davis v. United States,* 417 U.S. 333, 346 (1974)) (quotation marks omitted). Because "under our federal system it is only Congress, and not the courts, which can make conduct criminal," denying retroactive application where a criminal statute has been held not to reach a defendant's conduct "would be inconsistent with the doctrinal underpinnings of habeas review." *Id.* at 620-21.

11

practice is to waive any applicable procedural defenses on collateral review." *Grzegorczyk v. United States*, 142 S. Ct. 2580, 2582 (2022) (Sotomayor, J., dissenting from denial of GVR and quoting from Brief of United States at 7-8).

In *Buck v. Davis*, 580 U.S. 100, 127 (2017), the Supreme Court held that the government waives a *Teague* defense by failing to raise it in a timely matter. It noted that "failure to raise a *Teague* argument at the petition stage is particularly 'significant' in deciding whether such an exercise of discretion is appropriate. ... When 'a legal issue appears to warrant review, we grant certiorari in the expectation of being able to decide that issue.'" *Id.* at 127 (citation omitted).

That is what the Solicitor General chose to do in Binday's case. Having responded to each of Binday's certiorari petitions, and aware of the arguments he consistently made, the government chose not to oppose Binday's request that the Supreme Court review the substantive basis for his conviction. That deliberate choice waived any government claim that Binday is barred procedurally from seeking relief.

The Supreme Court recognized that the government had chosen not to pursue procedural claims here because it granted certiorari on Binday's question about the viability of right to control fraud, vacated, and directed this Court to consider Binday's arguments in light of *Ciminelli* (and nothing else).

"[T]he standard for an order granting certiorari, vacating the judgment below, and remanding the case (GVR) remains as it always has been: A GVR is appropriate when 'intervening developments ... reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome' of the matter." *Wellons v. Hall*, 558 U.S. 220, 225 (2010) (quoting *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (*per curiam*)).

12

While a GVR does not reach the ultimate merits of a case, it does "indicate" that the Supreme Court determined that an intervening decision is "sufficiently analogous and, perhaps, decisive to compel re-examination of the case." *Henry v. City of Rock Hill*, 376 U.S. 776, 777 (1964).  *See Simpson v. Jackson*, 2014 WL 5824895, at *5 (S.D. Ohio Nov. 10, 2014) ("[A] 'GVR' (grant, vacate, and remand order) or limited remand [] constrains the Court to address only the effect of [an intervening Supreme Court decision] on this case") (citing *United States v. Bowers,* 220 F. App'x 402, 404–05 (6th Cir. March 19, 2007) (GVR constrains review to issue of application of *United States v. Booker,* 543 U.S. 220 (2005)); *United States v. Orlando,* 363 F.3d 596, 601 (6th Cir. 2004) (remand may be limited to issue identified by appellate court); *In re Whirlpool Corp. Front–Loading Washer Products Liability Litigation,* 722 F.3d 838, 845 (6th Cir. 2013) (GVR constrains review to application of the "task assigned to us").

Thus, this Court should limit its review to the effect of *Ciminelli* on Binday's conviction.

## II.   A MOTION BASED ON *CIMINELLI* AND THE SUPREME COURT'S ORDER VACATING THIS COURT'S 2021 ORDER IS NOT SECOND OR SUCCESSIVE

### A. The Meaning of Second or Successive.

Section 2255(h) is a "gatekeeping provision" barring motions challenging federal convictions when they are "second or successive" and do not rely on new evidence or a retroactive, constitutionally based Supreme Court decision.  The phrase "second or successive" is not "self-defining."  *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007).  It does not apply to all collateral petitions "filed second or successively in time, even when the later filings address a ... judgment already challenged in a prior ... application."  *Id.* at 944. Instead, "second or successive" is a "term of art," *Slack v. McDaniel*, 529 U.S. 473, 486 (2000), that "takes its full

13

meaning from [the Supreme Court's] case law, including decisions predating the enactment of [section 2255(h)]." *Panetti*, 551 U.S. at 943-44. Since the phrase "second or successive" limits the courts' jurisdiction, it must be read narrowly. *Castro v. United States*, 540 U.S. 375, 381 (2003).

First, courts must ask whether a "later-in-time filing would have 'constituted an abuse of the writ, as that concept is explained in our [pre-AEDPA] cases.'" *Banister v. Davis*, 140 S. Ct. 1698, 1705-06 (2020) (quoting *Panetti*). "If so, it is successive; if not, likely not." *Id*.

A person abuses the writ when he raises the *same ground* in a later petition that was rejected on the merits in an earlier petition. *Sanders v. United States*, 373 U.S. 1, 15 (1963).[7] It is also an abuse of the writ to raise in a later petition a claim that *could have been* developed in the earlier petition because a court need not "tolerate needless piecemeal litigation [or] to entertain collateral proceedings whose only purpose is to vex, harass, or delay." *Id*. at 18.

The abuse of the writ doctrine requires courts to "look to the substance of the claim the application raises and decide whether the petitioner had a full and fair opportunity to raise the claim in the prior application." *Magwood v. Patterson*, 561 U.S. 320, 345 (2010) (Kennedy, J., dissenting) (citing *Panetti*, 551 U.S. at 947). "[I]f the petitioner had no fair opportunity to raise the claim in the prior application, a subsequent application raising that claim is not 'second or successive,' and [AEDPA's] bar does not apply." *Id.* at 346 (Kennedy, J., dissenting) (citing *Panetti*, 551 U.S. at 947).

---

[7] *Sanders* also held a district court had discretion to nevertheless consider the petition if the "ends of justice would not be served by reaching the merits of the subsequent application." 373 U.S. at 15. That part of the definition was eliminated by AEDPA. *Bannister*, 140 S.Ct. at 1707.

While AEDPA is more stringent than prior law, it "did not redefine what qualifies as a successive petition." *Banister*, 140 S. Ct. at 1707.

Second, the Supreme Court directs lower courts to consider the purpose of section 2255(h): its restrictions were meant to "conserve judicial resources, reduc[e] piecemeal litigation," and "lend[] finality to state court judgments within a reasonable time." *Id.* at 1706 (quoting *Panetti*).

Third, with those goals in mind, courts must consider "'the implications for habeas practice' of allowing a type of filing, to assess whether Congress would have viewed it as successive." *Id*. at 1706 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998)).

Thus, a court may not reject a later in time section 2255 motion simply because it challenges the same judgment as an earlier motion. In *Stewart* and *Panetti*, the Supreme Court authorized later in time habeas petitions in which inmates contended they were mentally unfit to be executed (a constitutional violation under *Ford v. Wainwright*, 477 U.S. 399 (1986)) because the claims were not "ripe" when they were originally filed.

These limits on the breadth of "second or successive" reflect Congress's codification of pre-existing "abuse of the writ" law. "It is not unusual for Congress to codify earlier precedent in the habeas context. Thus, for example, … the abuse of the writ doctrine applied in *Sanders v. United States,* 373 U.S. 1 … (1963), [was] later codified. See 28 U.S.C. § 2254(b)." *Williams v. Taylor*, 529 U.S. 362, 380 n.11 (2000).[8]

---

[8]    Justice Stevens's opinion where this footnote resides was not the majority opinion on the Court's decision on federal review of state court decisions; Justice O'Connor wrote that portion. But neither Justice O'Connor nor any other Justice disagreed with Justice Stevens's explanation that "second or successive" in section 2254 (and thus also in section 2255) meant the same before and after AEDPA.

Lower courts have recognized the limited scope of the "second or successive" requirement. This Court authorized later in time petitions in the two cases it cited in the 2021 Order. *See Vu v. United States*, 648 F.3d 111, 113-14 (2d Cir. 2011) (later petition not barred when the first petition was an effort to reinstate his appeal after his attorney failed to perfect an appeal); *Whab v. United States*, 408 F.3d 116, 120 (2d Cir. 2005) (later petition not barred even though first petition denied on the merits because the request for a certificate of appealability on the first petition had not yet been finally resolved in this Court).

Other courts have applied *Panetti*'s reasoning to changes in a petitioner's personal circumstances and to changes in the law. *See In re Jones*, 54 F.4th 947, 950 (6th Cir. 2022) (Sutton, J.) (second in time petition not second/successive when a new Supreme Court decision authorized re-sentencing: courts have "long entertained repeat habeas petitions when subsequent occurring events have changed the situation of the petitioner so as in fact to present a new case for consideration"; to do otherwise would encourage prisoners to "pack[] their first § 2255 petition[] with speculative or unripe claims"); *Scott v. United States*, 890 F.3d 1239, 1252-55 (11th Cir. 2018) (*Panetti* applied to newly discovered *Brady* claims but panel was required to rule otherwise due to a prior conflicting panel decision); *Stewart v. United States*, 646 F.3d 856, 852 (11th Cir. 2011) ("[W]hen a [legal] claim could not have been raised in a prior habeas petition, courts have interpreted *Panetti* to permit that claim to be raised in a subsequent petition[.]"); *In re Jones*, 652 F.3d 603, 605 (6th Cir. 2010) (petition authorized where predicate (change in parole law) arose after earlier petitions because the claim was "unripe when his initial petition was filed"); *Johnson v. Wynder*, 408 F. App'x 616, 619 (3d Cir. 2010) (legal claim that ripened into an actual innocence claim after first habeas petition was not second or successive: "We see no reason to avoid applying *Panetti* in the context of other types of claims that ripen only after an initial federal habeas

16

petition has been filed."); *United States v. Lopez*, 577 F.3d 1053, 1064 (9th Cir. 2009) ("The considerations the [Supreme] Court identified in support of its holding are not specifically limited to *Ford* claims, and therefore must be considered in deciding whether other types of claims that do not survive a literal reading of AEDPA's gatekeeping requirements may nonetheless be addressed on the merits.").

Thus, a person who raised an issue on appeal and lost, and then chooses to raise a different issue in a 2255 motion, may raise the original appellate issue in a later in time 2255 motion after an intervening change in the law because such a motion is not second or successive. He *could not* make the argument in his first 2255 motion, *United States v. Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) ("It is well established that a § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" (citation omitted)).[9] And he *did not* make (and thus could not repeat) the motion in his first 2255 motion. He made the argument on appeal and that preserved his ability to revive that argument if the law changed.

The proceedings in *Jones v. Hendrix* support the distinction between those petitioners who raise (losing) arguments on appeal and those who do not: the "retroactive constitutional" exception only comes into play for people, like Jones, who fail to raise the issue on direct appeal and then attempt to benefit from a non-constitutional decision.

---

[9]     In his original 2255 motion, Binday reminded the district court and this Court about his appellate argument and petitioned the Supreme Court in connection with *Kelly* to consider the legality of right to control fraud, thus giving all the courts an opportunity to reverse the right to control fraud theory multiple times.

Jones "flooded the federal dockets with unsuccessful postconviction challenges, including numerous § 2255 motions," *Jones v. Hendrix*, 8 F.4th 683, 685 (8th Cir. 2021), *aff'd,* 143 S. Ct. 1857 (2023), but he never raised the *Rehaif v. United States*, 139 S. Ct. 2191 (2019), issue: "Jones *could have* raised his *Rehaif*-type argument either on direct appeal or in his initial § 2255 motion. Although our precedent was at that time against him, he nonetheless *could have* succeeded before the *en banc* court or before the Supreme Court. And, regardless, the question is whether Jones could have raised the argument, not whether he would have succeeded." *Id*. at 687 (emphasis added).

In other words, the Eighth Circuit held, if Jones had raised the *Rehaif* issue on direct appeal or in an earlier 2255 motion—a fact that distinguishes Jones from Binday—then a later in time 2255 motion would not have been second or successive. Congress wanted defendants to include all their potential claims in an appeal, even if the likelihood of success was small.

This Court similarly held that someone who raises a claim on direct appeal that is later vindicated by a Supreme Court decision may revive that claim in a section 2255 motion. In *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003), this Court held that Cephas "could plainly have raised [his *Bailey* claim] on direct appeal" and did not, so was foreclosed from raising it later by way of a section 2255 or 2241 motion. This Court clearly meant that, if Cephas had raised the claim on direct appeal—as Binday did—then he was not foreclosed from raising it later when the Supreme Court decided the issue in his favor. Otherwise, the distinction this Court drew makes no sense.

When this Court decided *Triestman v. United States*, 124 F.3d 361, 368 (2d Cir. 1997), *abrogated by Jones v. Hendrix*, 143 S. Ct. 1857 (2023), it construed the "second or successive" provision *literally* as prohibiting any second in time petition that did not meet the new evidence or retroactive constitutional standard.

18

*Id*. at 366. Because the *literal* reading of section 2255's second or successive requirement appeared to foreclose Triestman from any remedy, which would raise "serious constitutional questions," *id*. at 377-78, the Court concluded that Triestman (who raised a statutory change in the law) could file a habeas petition under section 2241 because section 2255(e) allowed such petitions when the section 2255 remedy was "inadequate or ineffective." *Id*.

By finding an alternative path for Triestman, this Court thus had no reason to consider the scope or meaning of "second or successive," nor did it have the Supreme Court's practical, historical, and more nuanced readings of "second or successive" from *Panetti*, *Magwood*, or *Bannister* to consider because they were not decided until 2007, 2010, and 2020. Those cases did not read the phrase "literally." To the contrary, the Supreme Court limited the scope of the phrase and vindicated its historical meaning to ensure that valid claims were considered, and abusive filings were rejected. Nothing in *Jones v. Hendrix* limited the flexible approach to the "second or successive" standard in those three cases.

Thus, this Court must reconsider its literal exclusion of second in time 2255 motions directed at a previously challenged judgment. All the reasons this Court gave in *Triestman* for why section 2255 was inadequate or ineffective apply with equal force to construing "second or successive" as only prohibiting second in time petitions that *could* have raised arguments in a first petition or on appeal (and did not). If the Supreme Court meant that a second in time motion was foreclosed even when the issue was raised on direct appeal, then it would not have vacated the 2021 Order in this case.

In *Vu* and cases like it, this Court has held that the right to appeal is so important—as the proper place to raise even doomed arguments—that a section 2255 motion to reinstate a lawyer-forfeited appeal is not even considered a

19

challenge to the conviction (though practically that motion is just the first step in the challenge to the conviction).

Unlike Vu's situation, Binday's attorneys were not at fault for the failure of Binday's direct appeal; this Court failed to recognize the merits of Binday's arguments. If a defendant cannot be burdened with his lawyer's error, then he cannot be burdened with the Court's errors, especially when he has pointed out the error. If a guilty plea is "constitutionally invalid" where the court erred in its application of the law, then an appellate court's affirmance of a conviction based on a legal error is equally so. *See Bousley v. United States*, 523 U.S. 614, 626 (1998) (citing *Davis v United States*, 417 U.S. 333, 346-47 (1974) (holding that petitioner could challenge conviction using same argument he raised on direct appeal)).

On the other hand, like *Vu*, Binday seeks to vindicate his right to appeal, though in Binday's case, that appeal right was denied by this Court's error, rather than by Binday's attorney. Like *Whab*, Binday's first petition is not final since this Court recalled the mandate from that petition, and so that judgment is not final. Docs. 109-111; *Binday v. United States*, No. 17-cv-4723 (SDNY), Doc. 19.

The considerations the Supreme Court detailed in *Panetti* and *Banister*—the abuse of the writ doctrine, the implications for habeas practice, and AEDPA's purposes —all demonstrate Binday's petition is not "second or successive."

B. Precluding Binday's Petition Now Is Inconsistent With The Abuse-Of-The-Writ Doctrine.

"[E]quitable principles govern[] abuse of the writ, including the principle that a suitor's conduct in relation to the matter at hand may disentitle him to the relief he seeks, and ... must be applied within the sound discretion of district courts." *Esposito v. Ashcroft*, 392 F.3d 549, 550 (2d Cir. 2004).

20

Here, the equities and the ends of justice both weigh in favor of finding that Binday's proposed petition is not second or successive. Binday's conduct would never have been considered an abuse of the writ either before or after AEDPA. In his direct appeal, Binday challenged the Second Circuit's "right to control" line of cases, but this Court rejected his challenge. He gave this Court and the Supreme Court multiple opportunities to review the theory, with arguments that the Supreme Court ultimately accepted. He did not file and lose a section 2255 motion on that issue, nor did he hold back his arguments to try to gain some advantage. Instead, almost Cassandra-like, he predicted the end of right to control fraud from the outset of his prosecution.

If Jones had done what Binday did, then he would have been able to raise his *Rehaif* argument, according to the Eighth Circuit. That is the critical distinction. In contrast to most other petitioners, Binday did not wait for a helpful decision and then file; he led the charge against the right to control. This Court should have seen the merits of Binday's arguments and should have reversed Binday's conviction on direct appeal in response to his en banc petition. The Court, not Binday, is at fault for that failure, and that strengthens Binday's arguments for relief.

C. An Overbroad Application Of "Second Or Successive" Will Damage Habeas Practice.

Precluding claims of innocence where the Supreme Court has invalidated the legal basis for a person's conviction just because he filed a 2255 motion after an appellate court incorrectly rejected his valid arguments on appeal would damage habeas practice.

For example: If two people are convicted of the same federal crime, both lose their appeals, and only one files (and loses) a section 2255 motion within AEDPA's statute of limitations, then only the person who sat on his hands would

21

be freed when, years later,[10] the Supreme Court rejects the legal basis for the convictions. That distorted outcome would result even if the petitioner raised his legal argument in the first petition and the court of appeals incorrectly ruled against him. It would mean that *every* later in time petition is barred as "second or successive" unless a court can fashion a reason for finding the later petition does not directly challenge the conviction but only "concerns" it. *See Urinyi v. United States*, 607 F.3d 318, 321 (2d Cir. 2010).

The illogic of this result is compounded in situations like Binday's. At each stage of his case, Binday challenged the right to control theory. This Court was unwilling to part from its precedent, but when the Supreme Court directly reviewed the theory, it confirmed what Binday argued all along.

It would be particularly unfair—and thus render the habeas remedy haphazard and inconsistent—to punish Binday for *this Court's* rejection of Binday's arguments then and now by calling Binday's proposed new petition "second or successive."

D. Precluding Binday's Petition After *Ciminelli* Impedes Finality And Deterrence Interests.

Characterizing Binday's proposed petition as second or successive would not advance the goal of finality; instead, it would tell the public that someone who advocates for himself—and is proved right—is nevertheless out of luck unless he sits on his hands for years.

The hypothetical discussed above demonstrates that silencing people like Binday and forcing them to wait years until the Supreme Court has time to review

---

[10]    Section 2255 runs the statute of limitations not just from the date on which the conviction became final, but also from the date a new, retroactively applicable right was recognized by the Supreme Court. §2255(f)(3).

their argument does nothing to advance the goal of finality. The incentive would be for prisoners to wait—sometimes decades—for the Supreme Court to issue an opinion that undermines the basis for their convictions, and only then file their postconviction motion. This illogical result does nothing to advance AEDPA's finality interests and instead impedes them.

Moreover, petitioners cannot always know *which* Supreme Court decision may undermine their conviction. So, to comply with AEDPA's one-year statute of limitations, they *must* make their arguments when they have a colorable claim. Binday believed *Skilling* undermined his conviction and made that argument on direct appeal. He believed *Kelly* (and now *Ciminelli*) undermined his conviction and so moved within one year of those decisions for relief. If the Supreme Court or this Court believed *Kelly* affected Binday's conviction, and Binday had decided to wait, then he would be denied the relief the courts would otherwise have granted.

Nor would denying Binday authorization promote deterrence. Over two decades ago, then Chief Judge Richard Posner explained why cutting off a person's ability to vindicate his own previous arguments promotes disrespect for the law: "The more accurate the process of determining guilt is, the less random punishment will be, and so the greater will be the law's deterrent effect. To put this point differently, greater accuracy in the determination of guilt increases the returns to being innocent." Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 STAN. L. REV. 1477, 1483 (1999). Other scholars have likewise stated that conviction of the innocent *decreases* deterrent effects. *See* Nuno Garoupa & Matteo Rizzolli, *Wrongful Convictions Do Lower Deterrence*, 168 J. Institutional & Theoretical Econ. 224 (2012).

In short, denying relief to Binday encourages delays and irrational and unjust results, with the judicial system gaming petitioners rather than the other way around.

### III.   BINDAY HAS MADE A PRIMA FACIE SHOWING THAT CIMINELLI IS A NEW RULE OF CONSTITUTIONAL LAW RETROACTIVE TO CASES ON COLLATERAL REVIEW

A. Binday Need Only Make a Prima Facie Showing that *Ciminelli* is a Retroactive Constitutional Decision.

At this stage, this Court may only deny this application if it finds Binday has not made out a prima facie case that *Ciminelli* was a retroactive constitutionally based decision. "[W]e understand the 'prima facie' standard of section 2244(b)(3)(C) to mean, as the phrase normally does, that the applicant's allegations are to be accepted as true, for purposes of gate-keeping, unless those allegations are fanciful or otherwise demonstrably implausible." *Quezada v. Smith*, 624 F.3d 514, 521 (2d Cir. 2010). "In this context, [prima facie] has the weakest possible meaning, indicating no more than that the applicant's claim should be considered by a district court." *Villanueva v. United States*, 893 F.3d 123, 132 (2d Cir. 2018).

Other circuits have expressed the standard as "not difficult to meet" and met with "sufficient allegations" that would "warrant fuller exploration in the district court"; a "lenient" standard. *In re Lott*, 366 F.3d 431, 433 (6th Cir. 2004) (quoting *Bennett v. United States,* 119 F.3d 468, 469 (7th Cir. 1997) (Posner, J.). *See Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997) ("By 'prima facie showing' we understand [it to be] simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.").

Once Binday makes out a prima facie case that *Ciminelli* is based on constitutional principles, this panel must authorize Binday's petition. Whether *Ciminelli* is constitutionally based and whether it is retroactive are typically

24

decisions for the district court in the first instance. *See Villanueva*, 893 F.3d at 126 (authorizing a second-in-time petition because petitioner made a prima facie showing that his sentence may have been based on the residual clause of the ACCA, which the Supreme Court later ruled unconstitutional in *Johnson v. United States*, 576 U.S. 591 (2015)). The court in *Villanueva* explained that it had previously instructed the district court to determine whether the petitioner's prior convictions qualified as predicates for ACCA and whether *Johnson* "announced a new rule of constitutional law made retroactive to cases on collateral review." *Id*. n.1. The Supreme Court made the same point in *Tyler v. Cain*, 533 U.S. 656, 664 (2001): "The stringent time limit [of section 2244] thus suggests that the courts of appeals do not have to engage in the difficult legal analysis that can be required to determine questions of retroactivity in the first instance."

B. *Ciminelli* Relied on Constitutional Principles.

*Ciminelli* was a retroactive, constitutionally based decision. The jury instruction in *Ciminelli* defendants mirrored the instruction used in Binday's case: the court told the jury that the word property "'includes intangible interests such as the right to control the use of one's assets,'" and the jury could find a victim lost its "right to control its assets" if it was "deprived of potentially valuable economic information." *Ciminelli*, 143 S. Ct. at 1125-26.

The Supreme Court reversed this Court's affirmance of the convictions in *Ciminelli* because "right to control fraud" is not a crime. It based that decision on several constitutional principles:

(1) The federal "fraud statutes do not vest a general power in 'the Federal Government ... to enforce (its view of) integrity in broad swaths of state and local policymaking.'" *Ciminelli*, 143 S.Ct. at 1126 (citing *Kelly* v. *United States*, 140 S.Ct. 1565, 1574 (2020). The right to control thus violates principles of *federalism*.

25

(2) Lower courts historically violated this limit on federal power by authorizing fraud prosecutions for intangible interests like honest services, honest elections, and the right of privacy, but the Supreme Court "halted that trend" in *McNally. Ciminelli*, 143 S.Ct. at 1127. In other words, the previous expansion of the fraud statutes resulted in unconstitutionally *overbroad* applications.

(3) The right to control theory "cannot be squared with the text of the federal fraud statutes. *Ciminelli*, 143 S.Ct. at 1127. It is a *constructive crime or offense*—a judicially created offense.

(4) The right to control theory is like the intangible interests that *McNally* rejected as overbroad because courts may not "construe the federal fraud statutes in a manner that leaves [their] outer boundaries ambiguous." *Ciminelli*, 143 S.Ct. at 1127 n.4. The right to control theory is thus unconstitutionally *ambiguous* and *overbroad* and violates the *rule of lenity*.

(5) The government conceded that the right to control theory expanded the federal fraud statutes "beyond property fraud as defined at common law and as Congress would have understood it." *Ciminelli*, 143 S.Ct. at 1128. It termed the right to control theory as "incorrect" and "overbroad," conceding that "[t]he Second Circuit has not always been consistent in its articulation of the requirements of the right-to-control theory, or in its efforts to ground those requirements in the elements of fraud." Brief for the United States, *Ciminelli v. United States*, U.S. Supreme Court, No. 21-1170, at 12, 24. In other words, the government conceded that right to control fraud was an unconstitutional *constructive crime*.

(6) Congress made no effort, after *McNally*, to include any intangible right other than honest services in section 1346, which "forecloses the expansion of the wire fraud statute to cover the intangible right to control." *Ciminelli*, 143 S.Ct. at 1128. Thus, Congress's "reverberating silence" about the right to control after

*McNally* means it did not criminalize a scheme to deprive someone of information. *Id*.

(7) The right to control theory represents a judicial expansion of "federal jurisdiction without statutory authorization." *Ciminelli*, 143 S.Ct. at 1128. It criminalizes contract breaches and torts in an "almost limitless variety of deceptive actions." *Id*. It "thus criminalizes traditionally civil matters and federalizes traditionally state matters"—violating *federalism* principles. *Id*.

Finally, the Supreme Court rejected the government's idea that it, as an appellate court, should "cherry-pick facts presented to a jury" and apply them to the "elements of a *different* wire fraud theory." *Id*. at 1129. "That is not our role." *Id*. (citing *McCormick v. United States*, 500 U.S. 257, 270 n. 8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

C. The Cases *Ciminelli* Relied on Were All Constitutional Decisions.

Each of *Ciminelli*'s reasons for reversal was based on a constitutional principle: federalism, overbreadth, ambiguity, due process prohibitions on constructive offenses, and the rule of lenity. The cases the Supreme Court relied on were all applications of those constitutional principles:

- The Court cited and discussed *Cleveland nine times*; *Cleveland* in turn relied on (a) <u>federalism</u> ("Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities" and "we will not read the mail fraud statute to place under federal superintendence a vast array of conduct traditionally policed by

27

the States." *Cleveland v. United States*, 531 U.S. 12, 24, 25 (2000)); and
(b) <u>ambiguity</u> ("we have instructed that "ambiguity concerning the ambit
of criminal statutes should be resolved in favor of lenity." *Id*. at 25).

- The Court also relied on the <u>federalism</u> and the <u>due process/constructive</u>
  <u>crime prohibition</u> discussion in *Kelly* (which *Ciminelli* cited *three times*):
  "This understanding reflects not only the original meaning of the text, but
  also that the fraud statutes do not vest a general power in 'the Federal
  Government ... to enforce (its view of) integrity in broad swaths of state
  and local policymaking.'" *Ciminelli*, 143 S. Ct. at 1126 (quoting *Kelly*,
  140 S.Ct. at 1574).

- The Court relied on *McNally*, which in turn relied on (a) <u>the rule of lenity</u>
  ("when there are two rational readings of a criminal statute, one harsher
  than the other, we are to choose the harsher only when Congress has
  spoken in clear and definite language." *McNally*, 483 U.S. at 359–60
  (1987)); (b) <u>the due process prohibition of constructive offenses</u>
  described in *Fasulo v. United States*, 272 U.S. 620, 629 (1926) ("There
  are no constructive offenses; and, before one can be punished, it must be
  shown that his case is plainly within the statute"); and (c) <u>the due process</u>
  <u>rule against ambiguous criminal statutes</u> and the improper delegation to
  prosecutors of the power to "set standards of disclosure." *McNally*, 483
  U.S. at 360.

- The Court relied on *Sadler*, which grounded its decision in <u>the rule of</u>
  <u>lenity</u>: "That silence also requires us to pick the more lenient reading of
  the wire-fraud law." *United States v. Sadler*, 750 F.3d 585, 592 (6th Cir.
  2014). *See Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022)
  (Gorsuch, J. concurring) (the rule of lenity is grounded in due process

28

guarantees of fair notice "by ensuring that an individual's liberty always prevails over ambiguous laws").

Constructive crimes or offenses are those that are "built up or created when a court enlarges a statute by altering or straining the statute's language, esp. to drawing unreasonable implications and inferences from it. — Also termed *constructive offense*; *implied crime*; *implied offense*; *presumed crime*; *presumed offense.*" CRIME, Black's Law Dictionary (11th ed. 2019). Constructive crimes violate due process because "[e]stablishing federal criminal liability is the sole province of Congress." *United States v. Rybicki*, 354 F.3d 124, 134 (2d Cir. 2003). "[L]egislatures and not courts should define criminal activity." *United States v. Bass,* 404 U.S. 336, 348 (1971).

Constructive offenses are unconstitutional because Congress has not adopted them: "We are aware that this is a criminal statute and must be strictly construed. This means that no offense may be created except by the words of Congress used in their usual and ordinary sense. There are no constructive offenses." *United States v. Alpers*, 338 U.S. 680, 681 (1950).

"Statutes creating crimes are to be strictly construed in favor of the accused; they may not be held to extend to cases not covered by the words used. … Before one may be punished, it must appear that his case is plainly within the statute; there are no constructive offenses." *United States v. Resnick*, 299 U.S. 207, 209–10 (1936). *See United States v. Eaton*, 144 U.S. 677, 687 (1892) (A constructive offense is one crafted by prosecutors and judges, not by Congress: "It is well settled that there are no common-law offenses against the United States.").

This Court recognized the constitutional defect of constructive offenses in *Rybicki*, 354 F.3d at 134: "*McNally* appears to have been decided largely on the basis of separation of powers considerations: Courts are not free to expand criminal liability for fraud beyond the clear statement of Congress." This Court

also recognized that when *McNally* said Congress would have to "speak more clearly," that meant honest services fraud, and other intangible property rights, were not crimes. Those words meant "Congress was required clearly to express its intention to criminalize that behavior if it wished to do so." *United States v. Rybicki*, 354 F.3d 124, 134 (2d Cir. 2003).

Honest services and the right to control were constructive offenses; that is why the Supreme Court reversed the convictions in *McNally* and *Ciminelli*. When Congress adopted section 1346, it spoke clearly enough to cover honest services violations coupled with bribes or kickbacks because those were the cases the Court decided Congress had in mind in adopting the statute. The rest of the government's and lower courts' constructions of section 1346 were too "amorphous"—that is, they were constructive offense that were too ambiguous to pass constitutional muster.

Recently, in *United States v. Porat*, No. 22-1560, 2023 WL 5009238 (3d Cir. Aug. 7, 2023), Judge Krause explained in concurrence that *Ciminelli* was firmly grounded in the Constitution, which requires courts to "rigorously" police the line between deceit and fraud. She labelled right to control fraud as "impossibly broad[], transforming the mail fraud statute into a scheme to enforce 'moral rectitude in commercial matters.'" *Id*. at *8 (Krause, J., concurring).

Judge Krause confirmed that the era of criminalizing torts and contracts "should have come to a grinding halt thirty-six year ago, when the Supreme Court held in *McNally v. United States* that the fraud statutes are 'limited in scope to the protection of *property* rights' only." *Id*. at *9 (Krause, J. concurring) (quoting Park, *The "Right to Control" Theory of Fraud: When Deception Without Harm Becomes a Crime*, 43 Cardozo L. Rev. 135, 144 (2021)). She explained that *Ciminelli* was grounded in the "constitutional principles" of "notice, federalism, and self-governance…. Novel theories of liability like the right to control thus

30

create 'a new line of criminality' lacking 'the imprimatur of democratic consensus' and reflecting only what 'prosecutors and judges ... personally disapprove ... for no better reason than that [they] disapprove it.' … *Cases like Ciminelli and Skilling thus also protect the constitutionality of the fraud statutes* by ensuring that they cover only conduct proscribed by the people's representatives." *Id*. at *10 (cleaned up) (emphasis added). *See United States v. Full Play Group*, 2023 WL 5672268, at *23 (E.D.N.Y. Sept. 1, 2023) ("the Supreme Court's issuance of *Ciminelli* in tandem with *Percoco* strongly suggests the Court's view that the scope of wire fraud offenses under both statutes must be narrowed and more clearly defined to avoid unconstitutional vagueness"); *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *5–6 (E.D.N.Y. July 12, 2023) (rejecting government's recent effort to create a new intangible right—the right to "contractual protections"— as just a "restatement of the same [right to control] argument").

Judicially created theories of liability that diminish or eliminate the government's burden to prove each element of a Congressionally defined crime are also defective because they make the government's job too easy. During the oral argument of *Ciminelli*, Justice Kavanagh pointed out that right to control fraud reduced the government's burden to prove all elements of a crime: "[T]he government has been pushing this theory for several decades, and lots of people have been convicted under it. And I think the reason is … it's *easier to convict people under this incorrect articulation of the theory than under the correct articulation of the law*. I think you [Solicitor General] just said that. And that's— that's very problematic to -- to think back on the various cases that have been there over the years. … [L]ooking back on the government pushing this theory all those years is not -- not an ideal scenario."

31

The government did not disagree, and instead blamed the Second Circuit for "insist[ing] on thinking about it this way." Indeed, the government suggested, "it's asking a lot of federal prosecutors to go to the Second Circuit, say here's some language that this court … has endorsed a couple of times, that they've never explicitly overruled, but we're going to tell you this is wrong." *Ciminelli*, Tr. Oral argument at 61-63.

https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-1170_q86b.pdf.

In short, the government came up with the theory, pressed its use in multiple trials, convinced this Court the theory was constitutional, and then blamed this Court for leading it down a primrose path.[11] Or, as Justice Jackson recently pointed out, "In its role as prosecutor, the Government often stakes out a maximalist position, only later to concede limits when the statute upon which it relies might be struck down entirely and the Government finds itself on its back foot." *United States v. Hansen*, 143 S. Ct. 1932, 1962–63 (2023) (Jackson, J. dissenting).

D. Ciminelli Is Retroactive in Binday's Case.

The holding in *Ciminelli*, coupled with the Supreme Court's grant of Binday's petition and its abrogation of *Binday*, is retroactive and eviscerates Binday's conviction.

---

[11]     Former Chief Judge Winter noted that he was "sailing against the wind in mail or wire fraud cases," *United States v. Siegel*, 717 F.2d 9, 23 (2d Cir. 1983) (Winter, J. dissenting), by objecting to the judicial expansion of the fraud statutes. As he explained, this Court (in *Wallach*) "acceded to the desire of prosecutors for the creation of amorphous crimes that would allow prosecutors to pursue hard-to-define improprieties—or conduct that was improper only in the eyes of the particular prosecutor—or to pressure individuals thought to possess knowledge of other criminal activities." Ralph K. Winter, *Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America*, 42 Duke L.J. 945, 956 (1993).

When the Supreme Court holds that a conviction "is not authorized by substantive law … '[t]here is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose.'" *Welch v. United States*, 136 S. Ct. 1257, 1266 (2016) (citation omitted); *see Bousley v. United States*, 523 U.S. 614, 620 (1998) (when "a substantive federal criminal statute does not reach certain conduct," the decision applies retroactively on habeas review). This retroactive application is necessary to address the "significant risk" that defendants might have been convicted for acts that were not criminal. *Id.*

In *Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004), the Supreme Court provided a blueprint for the application of retroactively applicable rules described in *Teague* and *Bousley*. There, the Court stated that new[12] *substantive* rules of constitutional law apply retroactively, explaining as follows:

> This includes decisions that narrow the scope of a criminal statute by interpreting its terms, … as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, …. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal" or faces a punishment that the law cannot impose upon him.

*See Welch*, 578 U.S. at 129 (Supreme Court decisions that "narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations

---

[12] "[A] rule is new unless, at the time the conviction became final, the rule was already 'apparent to all reasonable jurists.'" *Edwards v. Vannoy*, 141 S. Ct. 1547, 1555 (2021). The decision in *Ciminelli* was not apparent at least *to this Court* and thus is "new."

that place particular conduct or persons covered by the statute beyond the State's power to punish" are retroactive).

    E.  <u>The Supreme Court's "Property" Decisions Have All Been Retroactive.</u>

    In previous cases when the Supreme Court narrowed the scope of the fraud statutes, rejecting lower courts' broad readings of those laws, courts have applied those rules retroactively in collateral proceedings. Thus, after *McNally*, several circuit courts of appeal held that it should be applied retroactively to undo honest services convictions. *See Ingber v. Enzor*, 841 F.2d 450, 455 (2d Cir. 1988) ("Because *McNally* overrules our prior decisions holding certain conduct under the mail fraud statute criminal, reversing years of circuit precedent, we conclude that it should be applied retroactively in Ingber's case."); *United States v. Shelton*, 848 F.2d 1485, 1489–90 (10th Cir. 1988) ("the opinion in *McNally* must be given retroactive effect in a section 2255 proceeding"); *United States v. Mitchell*, 867 F.2d 1232, 1233 (9th Cir. 1989) ("We agree with the Courts of Appeals of the Second and Tenth Circuits that *McNally* is fully retroactive"); *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir. 1988) ("the rule announced in *McNally* is to be applied retroactively in a collateral attack on a conviction").

    After *Cleveland*, the lower courts held that holding was retroactive on collateral review. For example, in *United States v. Peter*, 310 F.3d 709, 711 (11th Cir. 2002), the court granted a writ of coram nobis because "the facts to which Peter pled guilty did not constitute a crime under *Cleveland.* Decisions of the Supreme Court construing substantive federal criminal statutes must be given retroactive effect."

    In the wake of *Skilling*, courts applied it retroactively and vacated honest services convictions. For example, in *Stayton v. United States*, 766 F. Supp. 2d 1260, 1269 (M.D. Ala. 2011), the court vacated the convictions of two defendants because it determined that the jury instructions were "flawed" and "overbroad" in

34

light of the subsequent *Skilling* decision. Likewise, the court in *Colino v. United States*, 2012 WL 1198446 at *15 (C.D. Cal. 2012), vacated a defendant's honest services conviction on a writ of error coram nobis after it determined that *Skilling* "radically changed" the definition of honest services, and the pre-*Skilling* jury instructions failed to require a finding that the defendant had received bribes or kickbacks and were thus "clearly erroneous." In *United States v. Post*, 950 F. Supp. 2d 519, 539 (S.D.N.Y. 2013), the court dismissed indictments, after trial and conviction, and in the wake of *Skilling*, where the government's case embraced "intangible rights fraud," which is "synonymous with 'honest services fraud.'"[13]

Indeed, the government conceded *Skilling* was retroactive on collateral review. *Martignoni v. United States*, No. 10 CIV. 6671 JFK, 2011 WL 4834217, at *9 (S.D.N.Y. Oct. 12, 2011) ("at oral argument, the Government acknowledged that the *Skilling* holding may be applied retroactively in a collateral attack on a conviction"); *Turner v. United States*, 693 F.3d 756, 758 (7th Cir. 2012) ("The government also concedes that *Skilling* applies retroactively to cases on collateral review."); *United States v. Jennings*, No. CIV. 11-150 RHK, 2011 WL 3609298, at *2 (D. Minn. Aug. 15, 2011) ("Although the Supreme Court did not speak to retroactivity in *Skilling,* the Government has not argued that it cannot apply

---

[13]    Other decisions that applied *Skilling* retroactively include *United States v. Jaramillo,* 413 Fed. Appx. 979, 980–81 (9th Cir. 2011) (mem.) (vacating conviction for honest-service mail fraud in light of *Skilling*); *United States v. McDonnell,* WL 2463194, *5 (C.D.Cal. 2011) ("[T]he *Skilling* decision may apply retroactively"); *United States v. Tehin*, No. CR 03-00236 SI, 2012 WL 3638543, at *7 (N.D. Cal. Aug. 22, 2012); *Rodrigues v. United States*, No. CR 01-00078 DAE, 2011 WL 529158, at *8 (D. Haw. Jan. 31, 2011) ("Because the decision in *Skilling* '[explains] its understanding of what the statute has meant continuously since the date when it became law,' … *Skilling* must apply retroactively to criminal convictions under 18 U.S.C. § 1346."), *aff'd,* 678 F.3d 693 (9th Cir. 2012).

retroactively…. This Court agrees that *Skilling* applies retroactively"), *aff'd,* 696 F.3d 759 (8th Cir. 2012); *United States v. Caso*, 200 F. Supp. 3d 227, 231 (D.D.C. 2012) ("the government concedes, that the *Skilling* decision applies retroactively").

There is no reason to think about *Ciminelli* any differently from the way the courts did after *McNally*, *Cleveland*, and *Skilling*.

F. The Supreme Court's GVR of Binday's Case Demonstrates *Ciminelli* Applies to Cases on Collateral Review.

The Supreme Court's decision to grant, vacate, and remand Binday's case also demonstrates that *Ciminelli* is a retroactive substantive rule of constitutional law. The Supreme Court knew that (1) Binday previously challenged the right to control theory on direct appeal and in a petition for a writ of certiorari; (2) he filed an ineffective assistance of counsel claim because his lawyer misapprehended the right to control theory (and he included his challenge to the right to control theory); and (3) he raised both the ineffective assistance of counsel claim and his right to control challenge in a certiorari petition.

The Supreme Court also reviewed this Court's 2021 Order that Binday was foreclosed from bringing a "second" section 2255 petition because of that previous petition. But by vacating that 2021 Order and directing this Court to consider Binday's case solely in light of *Ciminelli*, it indicated the holding of *Ciminelli* was both constitutional and retroactive. "The Supreme Court seems to have indicated that it is intended to apply retroactively, by granting IFP, granting a writ of certiorari, and vacating and remanding several judgments based on the honest services provision in light of the decision in *Skilling*." *DeGuzman v. United States*, No. SA-08-403(2)-XR, 2011 WL 777934, at *2 (W.D. Tex. Feb. 25, 2011).

Given the government's waiver of any procedural objection to the Supreme Court considering Binday's case and that court's decision to grant certiorari and treat Binday no differently from the way it treated the *Ciminelli* defendants who

36

were on direct appeal, it is apparent that *Ciminelli* is retroactive to cases on collateral review.

In short, every position taken by the government in connection with Binday's petition to the Supreme Court, and every decision regarding Binday by the Supreme Court, reflects the government's and the Supreme Court's conclusion that Binday's conviction stands or falls based on the holding and reasoning of *Ciminelli*, and that no procedural bar to considering that question exists.

G. *Ciminelli* Was Not a Statutory Interpretation Case.

The government has claimed *Ciminelli* only interpreted a statute—though it conceded the federalism component of the decision[14]—because Congress *could* pass a law criminalizing right to control fraud in the future. The government is confused.

If the Court in *Ciminelli* was engaged in pure statutory interpretation, one would expect the opinion to look like previous statutory interpretation cases. For example, in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the Supreme Court considered whether the word "knowingly" in a statute that prohibited illegal aliens from possessing a gun modified one or more elements of the offense—that is, did the defendant have to know he was in the country illegally? While that inquiry might require prosecutors in the future to adduce more evidence than they otherwise would (that is, *how* a jury could find the defendant knew he was in the country illegally), it did not limit the universe of people who might be prosecuted.

In its analysis, the *Rehaif* Court did not refer to a single constitutional concept. Instead, it (a) referred to Black's Law Dictionary; (b) invoked statutory construction rules that generally require attaching "knowingly" to each element of

---

[14]    Gov't Opposition to Bail Motion, *Binday v. United States*, No. 21-1206, Doc. 77, at 17

the offense; (c) presumed there was a scienter element based on an "interpretive maxim"; (d) discussed how the word knowingly "modified" a verb in the statute; (e) noted that the "*proper interpretation* of the statute thus turns on what it means for a defendant to know that he has 'violate[d]' § 922(g)"; and (f) discussed Congress's "intent"—a classic part of statutory interpretation  *Id*. at 2195-96.

The dissent argued that the majority had overturned a "long-established interpretation" of a criminal statute.  *Id*. at 2201.  It noted that the "majority does not claim that the Constitution requires proof of mens rea for every status element or every element that has the effect of criminalizing what would otherwise be lawful conduct."  *Id*. at 2211.

Similarly, in *McDonnell*, the Court was tasked with "the proper interpretation of the term 'official act.'" *McDonnell v. United States*, 579 U.S. 550, 566 (2016).  The Court adopted a "more bounded" definition than that advocated by the government.  *Id*. at 567.  It referred to (a) Webster's dictionary, (b) the "familiar interpretive canon *noscitur a sociis,* 'a word is known by the company it keeps,'" (c) the presumption that words used in a statute should not be superfluous, and (d) previous statutory interpretation cases to identify those boundaries.  *Id*. at 568, 569, 571.

In contrast, in a separate section of its opinion, the Court in *McDonnell* explained that the government's proffered interpretation "would raise significant constitutional concerns" because it would sweep campaign contributions and any political decisions into the federal bribery statute.  *Id*. at 574-75.  In this portion of its opinion, the Court cited to *Skilling* as prohibiting overbroad and indefinite statutory constructions and to *McNally* as limiting the use of criminal laws to set standards of conduct.  It also pointed out that the federal government interfered with state prerogatives to regulate state officials, which violated federalism. *Id*. at 576-77.

*Ciminelli* has no discussion of the statutory interpretation principles the Court used in *Rehaif* or *McDonnell*. It does not inform the government of *how* prosecutors may prove a case; it tells them that *conduct* previously proscribed by lower courts does not fit Congress's statute. The Supreme Court was not concerned with defining "property"; it long ago told the lower courts that property under the fraud statutes is limited to its traditional meaning and "rights of allocation, exclusion, and control" are not property. *Cleveland*, 531 U.S. at 23.

Moreover, the Supreme Court has already rejected the government's contention that Congress's ability to "speak more clearly" means *Ciminelli* is mere statutory interpretation. In *Bousley*, the Court applied *Bailey v. United States,* 516 U.S. 137 (1995), retroactively even though Congress could, and did, modify section 924(c) after *Bailey* to criminalize simple possession of a gun in connection with a drug offense. *See United States v. O'Brien,* 560 U.S. 218, 232 (2010) (describing the amendments to section 924 that were made in "direct response to this Court's decision in *Bailey*"); *see also Smith v. Goguen,* 415 U.S. 566, 581-82 (1974) (granting habeas corpus on the basis that the petitioner's statute of conviction was unconstitutionally vague, even though "nothing prevents a legislature from defining with substantial specificity" the conduct it intended to criminalize).[15]

The Court in *Welch* reaffirmed that when its decision "changes the scope of the underlying criminal proscription," it is a substantive constitutional and retroactive rule. *Welch*, 578 U.S. at 131. The *Welch* Court rejected the same

---

[15] The Supreme Court has held that its rules of substantive retroactivity apply even though Congress may act in the future. Thus, *McNally* made clear that Congress could speak more clearly if it wanted to cover honest services. 483 U.S. at 360. The Court said the same thing in *Cleveland*, 531 U.S. at 20, and *Skilling*, 561 U.S. at 402.

argument the government made in opposition to Binday's bail motion in this Court—that a decision interpreting a criminal statute simply defines what Congress always meant and thus is not based on the Constitution. *Id*.

> That argument is not persuasive. Neither *Bousley* nor any other case from this Court treats statutory interpretation cases as a special class of decisions that are substantive because they implement the intent of Congress. Instead, decisions that interpret a statute are substantive if and when they meet the normal criteria for a substantive rule: when they "alte[r] the range of conduct or the class of persons that the law punishes."

*Welch*, 578 U.S. at 134 (citation omitted).

Contrary to its position here, in *Welch*, the government *agreed* that the Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591, 594 (2015), was retroactive, so the Supreme Court appointed an amicus to argue against retroactivity. And, as the Court noted, even amicus "acknowledge[d] that a decision that saves a vague statute by adopting a limiting construction is substantive, so anyone who falls outside the limiting construction can use that decision to seek relief on collateral review." 578 U.S. at 134. For that point, the Court cited to *Skilling*, which (like *Ciminelli*) limited the reach of the fraud statutes because to do otherwise would allow prosecutions based on an unconstitutionally vague construction of a statute. *See Skilling*, 561 U.S. at 405 (limiting the construction of section 1346 because otherwise it would be "impermissibly vague").

Responding to the amicus effort to restrict the meaning of "substantive," the *government* conceded that "in *Bousley*, the Court explained that statutory-interpretation decisions of this Court holding that a federal criminal statute does not reach certain conduct are 'like' decisions that 'plac[e] conduct beyond the power of the criminal law-making authority to proscribe,' and are therefore

40

substantive and retroactive, because of the 'significant risk that a defendant stands convicted of an act that the law does not make criminal.'" Brief of the United States, *Welch v. United States of America*, 2016 WL 1165972, at *15 (U.S. 2016) (explaining that when *Bailey* "narrowed the construction of 'use' of a firearm in 18 U.S.C. section 924(c) to exclude possession offenses," the decision "was substantive and retroactive, …even though Congress could (and did) amend Section 924(c)(1) to restore possession offenses to the statute").

Having prevailed in *Welch* on when a new decision is constitutional and retroactive and having defeated the amicus effort to create an exception to those rules for statutory interpretations, the government is estopped from rearguing here the *Welch* amicus's rejected claim. *See New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding").

The hypothetical possibility that Congress might pass a statute to punish certain conduct in the future has no bearing on the lawfulness of confinement imposed *in the past* under the statute. Any future amendment to the fraud statutes would not—and, under the Ex Post Facto Clause, *could* not—affect persons who were sentenced for right to control fraud. Once the Supreme Court has decided that conduct is not covered by a criminal statute, it has prohibited prosecution of that "offense" and vindicated those convicted under the faulty construction by lower courts.

Tomorrow, Congress might pass a law criminalizing "fraud by threats," but that does not mean such a prosecution today would be legal. *Fasulo*, 272 U.S. at 628 ("If threats to kill or injure unless money is forthcoming do not constitute a scheme to defraud within the statute, there is none in this case.")

41

Thus, it does not matter that Congress might, in the future, adopt a right to control fraud offense. *Ciminelli* articulated a substantive rule and, as such, it applies retroactively. Justice O'Connor put the rule simply:

> When the Court holds as a new rule in a subsequent case that a particular species of primary, private individual conduct is beyond the power of the criminal lawmaking authority to proscribe, it necessarily follows that this Court has "made" that new rule retroactive to cases on collateral review. The Court has done so through its holdings alone, without resort to dicta and without any application of principles by lower courts.

*Tyler*, 533 U.S. at 669 (O'Connor, J. concurring).

In other words, *Ciminelli* is retroactive regardless of whether the Supreme Court expressly proclaimed it retroactive.

## IV. THE COURT MAY RECALL ITS MANDATE FROM BINDAY'S DIRECT APPEAL AND APPLY *CIMINELLI* TO A REVIEW OF THE CONVICTION

Binday is the direct beneficiary of the Supreme Court's rejection of the legal basis of his conviction. This Court may, therefore, recall the mandate from the now-abrogated *Binday* decision and reverse Binday's conviction.

As this Court explained:

> Our power to recall a mandate is unquestioned. *See generally* 16 Charles A. Wright, Arthur R. Miller, Edward H. Cooper & Eugene Gressman, *Federal Practice and Procedure* § 3938 (1977). The power "apparently originated in the inherent power of all federal courts to set aside any judgment during the term of court at which it was entered." *Id.* at 276. It "exists as part of the court's power to protect the integrity of its own processes," *Zipfel v. Halliburton Co.*, 861 F.2d 565, 567 (9th Cir.1988), and is analogous to the power conferred on district courts by Fed.R.Civ.P. 60(b).

> Amendments to the federal judicial code in 1948 extended
> this power beyond the current term of court, … and we
> thus have the power to reopen a case at any time. ...
> However, this power is to be "exercised sparingly," ... and
> reserved for "exceptional circumstances."

*Sargent v. Columbia Forest Prod., Inc.*, 75 F.3d 86, 89 (2d Cir. 1996) (citations omitted).

In *Zipfel*, the court held that "[w]hen a decision of the Supreme Court departs in some pivotal aspects from a decision of a federal appeals court, recall of a mandate may be warranted to the extent necessary to protect the integrity of the court of appeals' prior judgment." One circumstance that may justify recall of a mandate is "[a] supervening change in governing law that calls into serious question the correctness of the court's judgment." *Sargent*, 75 F.3d at 90 (citations omitted).

This Court has identified four factors to consider in determining whether to recall a mandate: "(1) whether the governing law is unquestionably inconsistent with the earlier decision; (2) whether the movant brought to the Court's attention that a dispositive decision was pending in another court; (3) whether there was a substantial lapse in time between the issuing of the mandate and the motion to recall the mandate; and (4) whether the equities 'strongly favor' relief." *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 709 F.3d 140, 142 (2d Cir. 2013) (citations omitted).

All those factors are satisfied here: (1) The Supreme Court expressly abrogated the governing law of this case (the affirmance in *Binday*); (2) Binday advised this Court several times that the Supreme Court would reject the right to control theory; (3) Binday's mandate was issued in 2016, and the Supreme Court finally acted in 2023, but that lapse of time was caused by this Court's continued

43

adherence to its case law and not because Binday delayed raising the issue; and (4) the equities favor relief for Binday: he repeated his challenge multiple times in the district court, this Court, and in the Supreme Court (in his own and others' cases). He falls into the category of people convicted of crimes who *always* challenged the government's and this Court's legal theory. Thus, all equities lie in his favor.

The decision in *Bottone v. United States*, 350 F.3d 59, 64 (2d Cir. 2003), is consistent with Binday's suggestion here for several reasons. <u>First</u>, in that case, this Court held that Bottone was "not asking us to reconsider arguments he made on direct appeal," and so could not ask to recall the mandate. Binday, on the other hand, is asking this Court to reconsider arguments he clearly made on direct appeal.

<u>Second</u>, unlike Binday, Bottone could not point to a Supreme Court decision that vindicated his own legal arguments and that voided the opinion affirming Bottone's conviction.

<u>Third</u>, Bottone relied on a procedural rule change by the Supreme Court in *Apprendi*, and those changes are *never* retroactive. *Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) ("New procedural rules do not apply retroactively on federal collateral review.").

<u>Fourth</u>, unlike *Bottone*, Binday's conviction (not sentence) hinged on the legality of the legal theory at the heart of his motion. *Bottone* was concerned with *how* to sentence, and "how" is procedural. Binday's challenge is concerned with *whether* his conduct fell within a criminal law. "Whether" and "if" are substantive questions about the reach of a criminal statute.

While this Court may recall the mandate to reverse Binday's conviction, it may not search out a new theory of criminal liability that the jury did not consider. The holding in *Ciminelli* is "the end of the case." *Ciminelli*, 598 U.S. at 316-17. *See Chiarella v. United States*, 445 U.S. 222, 236 (1980) (appellate court "cannot

44

affirm a criminal conviction on the basis of a theory not presented to the jury"); *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury.").

In any event, the right to control theory was the sole theory against Binday. There was no other legitimate theory charged; the district court did not mention broker's "commissions" even once.[16]  Binday's conviction would have to be reversed even if there were a legally valid theory presented with the invalid theory. *Yates v. United States,* 14 354 U.S. 298 (1957)*.* "Where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory formed the basis for the conviction." *United States v. Szur*, 289 F.3d 200, 208 (2d Cir. 2002).

If this Court recalls the *Binday* mandate and contemplates considering other theories of liability, then Binday requests further briefing to explain why the evidence was insufficient to convict Binday under a traditional money theory.

---

[16]    The government argued that Binday earned commissions, but it never asked the district court to identify his commissions as "money or property," and the trial court did not do so.  For good reason: the insureds *paid* for the policies, the insurers kept those premiums, and commissions are part of the sales price of insurance contracts and thus do not differ from a salary.  Maintaining a salary cannot satisfy the "obtaining money or property" element of fraud. *United States v. Yates,* 16 F.4th 256, 266-67 (9th Cir. 2021); *see also United States v. Goodrich,* 871 F.2d 1011, 1013-14 (11th Cir. 1989).  As this Court said, "the commissions were not a stand-alone economic harm," *Binday*, 804 F.3d at 585.

## V.    CONCLUSION

Justice will be served only with a reversal of Michael Binday's conviction. The Court should either allow Binday to make these arguments to the district judge or recall the mandate from the direct appeal and reverse the conviction.

Dated: September 12, 2023

Respectfully Submitted,



_____

David W. Shapiro, NY Bar #2054054
The Norton Law Firm

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENT, AND TYPE STYLE REQUIREMENT

1. The undersigned counsel of record for Petitioner Michael Binday certifies pursuant to Federal Rules of Appellate Procedure 32(g) that the foregoing brief contains 13,990 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Word Count feature of Microsoft Word 2016.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font of Times New Roman.

Dated: September 12, 2023

/s/ *David W. Shapiro*

David W. Shapiro